All right, we're back on the record. We'll now hear Williams v. Papi, number 16-4354. Thank you, Your Honor. I'm Judge McLaughlin for the nine municipal police officer defendants. I would request three minutes for rebuttal time, if I may. That'll be granted. Thank you, Judge. This appeal presents an issue of pure law. It is an appeal of a denial of qualified immunity for the individual officers. At summary judgment, the trial court did it on the basis that it found contested issues of fact. The appeal, however, does present an issue of pure law and is appealable under Barron's v. Pelletier. Because what the trial court did when it did the facts, then it also found ... So you're prepared to embrace, for purposes of your motion, all of the facts as laid out by the district court? Yes, as laid out by the district court and as argued by the plaintiffs and as the district court found substantiated. We believe some of them weren't. That's not before us on appeal. Right. So when there are disputes over William's demeanor, for example, you're prepared to accept and do accept for purposes of this argument that he was calm, that he was engaging with the police in conversation, that he was not agitated, that until the police barged into the bedroom, he was of being dangerous. That's how I read the district court's record, and you accept that? Is that what I'm hearing? You do accept that. I would offer the wrong qualification. The district court's characterizations with that respect occur prior to the officer's entry into the home. Well, there's no indication, at least until ... Yeah, the district court, he retreats to the But he's engaging, he's having conversations, he's telling somebody, hey, I like being on the phone with that guy. He's asking to interact, in fact, with family members, and he's doing all those things with no indication that he's agitated or dangerous, right? Well, I would agree with respect to no exaggeration or aggravation. However, he is steadfastly, throughout this two-hour process, adamantly refusing to go voluntarily. Yeah. He doesn't want to go with the police, but we don't shoot people for that, typically, right? Correct. Okay. And likewise, there's no dispute, at least at this point, about ... Or maybe there is, about Officer Pappy deciding he's going to provide, quote, lethal cover, unquote, right? For purposes of our analysis, we take it as a given that he went in there thinking that, right? That is correct. And he was, incidentally, for the record, the only officer who had his gun out at any time during the encounter. Right. Can I ask you ... We've got this poker, eventually. Is there a dispute as to whether it has a point on it or not? There is a dispute. That dispute is not material for us because we're conceding, for purposes of this appeal, that it did not have a point. Okay. It's a two-foot poker. He's in a bedroom. There's no fireplace in there. He's using it in front of himself to keep the police at bay. When the police break through the door, there is an officer with a ballistic shield who comes through the door with the officer with the handgun out. They're the first two officers in. They're jammed through the door. The officer with the ballistic shield ends up with the ballistic shield jammed against the wall and underneath himself. It's disabled. Two other officers push through immediately after. There's four guys. They're right there with Mr. Williams, who's, like I say, using the poker to keep them at bay. That's another issue. It is a contested issue of fact whether he actually attempted to attack them. We're conceding that he didn't, that he was using the poker to keep them at bay and resist arrest. There are attempts to apprehend them, as they were legally obligated to do, under the 302A warrant, sworn out by his treating psychiatrist. We know about that. You are conceding that he was not attacking them. He was warding them off. Correct. Stick with me. If it's accepted that the officers were on the scene for two hours or less, it's accepted for purposes of discussion that he was engaging in dialogue with the police, even if he was saying, I'm not going to go. Although, I'll have a question for you about that in a minute. It's accepted that he wasn't attacking them with this blunt poker. He was using it to ward them off. If it's accepted that there was no means for him to escape, and I believe that that's accepted, right, how can it be that lethal force was a reasonable alternative at that point? There's a couple of distinctions I would like to make. The first is, only one officer used lethal force. It was Officer Pappy. Does that mean he needs separate counsel? No, I don't believe it does. I'm puzzled by that. If the distinction you're making is, hey, those other nine guys shouldn't go down with Officer Pappy, how come they can all be represented by one attorney? I don't want to put you in an awkward spot. If you can't answer that right now, that's fine. Doesn't that raise a significant question? Not to my mind. I guess I'm not in a position to respond to that. We've handled this case from non-lethal force in the form of three tasers were used prior to that. He continued to resist. They were outside the bedroom, ordering him to open the door. He tells them, you're going to be sorry if you come in. Right, but you have already conceded, as I think you must, that he wasn't not attacking them. You're accepting for purposes of the discussion what the district court has said. So, you're going to be sorry. That can mean all kinds of things. If it is indeed the case that he's just trying to stop them from taking him into custody, how can you get to lethal force being okay? That's the leap that I'm having a challenge with. You get to lethal force... You're asking for summary judgment on this basis. Yes, because the qualified immunity analysis looks at what officers understood, what they did with that understanding, and what the state of the law was at that time to alert them that what they were doing was clearly wrong. But did something change? He's defending himself. He's not being offensive. It's defensive. Are you saying at some point it became offensive, and that is what justified... I'm saying that the officers reasonably perceived it as offensive. And what happens, they pop through the door. They're basically within arm's reach of this man. They tried... So, you are disputing the facts? No. I don't see how you can have it both ways. Either he's using that poker defensively, and they're not under threat. They just have to back off. Or he's attacking, and they're under threat. You could say it's ambiguous, in which case, I guess you'd have to concede there's a fact dispute. But for purposes of analysis now, if you're accepting that he's in a defensive posture, how can you assert they perceived him to be in an offensive posture? They're jammed in. These four officers are jammed in. They can't move. They're effectively within arm's reach of this man, who has resisted commands, first commands to put it down. Secondly, three unsuccessful taserings have also failed. They haven't gotten his attention. He continues to do it. Can they walk backwards? No. Why not? They can't go back out the door? They can't. They're jammed, Your Honor. It's undisputed that... The fact that 10 of them came in there, you're saying that means they couldn't retreat. They couldn't turn behind and say, hey guys, back up. That's correct. And the reason I say that is because we judge officer actions and qualified immunity under the circumstances that they were in. It's a hyper-pressurized environment. We don't hold them to second-guessing, 20-20 hindsight. But we do require their actions to be reasonable, right? Yes. So back to along the lines of what we've been talking about, this lethal force. You say now that it's changed, at least in the officers' minds, which is important, from defensive to offensive. And yet you say also that you go with what the district court said. Did the district court debate? The district court does find facts. It's late in its finding of facts that indicate that the officers did feel safe to incite Sergeant Hardy's testimony, and I believe also Officer Pappy's. Those were two of the officers who were jammed in the room and couldn't move. Judge, can I go on? Yes. Can you hear me now? Yes. Okay. What I'm hearing, Counselor, is disputed fact after disputed fact after disputed fact. Could you state for me precisely what is the legal issue upon which you feel you should prevail? Mr. Arnn, we believe that we should prevail because there is no case law of a binding precedent that would alert these officers as to how they should have served a 302 mental health warrant sworn out by a treating psychiatrist indicating that this individual was a clear danger to others, had threatened to kill his wife, had actually grabbed her in the recent future, up to the point that when they are obligated to go and get him under the warrant, they're confronted with him in his closed quarters, he is completely noncompliant, and they have to take the action that they reasonably believe is necessary to protect officer safety under those circumstances. There is no case. Sheehan discloses analog. The trial court did not analyze it at all under Sheehan. Sheehan did not require an actual attack. They shot Sheehan as she was dancing with a knife. And that doesn't strike you as different from somebody in a defensive posture with a blunt poker? Not within arm's reach, no. And I would also call the court's attention to, in a non-precedential Third Circuit opinion, Royal versus the city of Scranton, which is effectively the same thing. And in that case, I don't believe there was even a verbal threat. They shot an individual with a knife who was advancing on them at a distance of about five to six feet. The touchstone in those cases is arm's reach and a weapon that can cause harm. I would have thought that the touchstone in those cases was the reasonableness of the defendant's actions, excuse me, the officer's actions, under all of the circumstances, right? All circumstances. If we have to take all the circumstances into account, isn't there a material difference between somebody screaming and coming at you with a knife who, if you leave them alone in the room, actually does have a means of escape in Sheehan? And somebody who's in a bedroom and with no means of escape saying, leave me alone. You view those as the same. I do view them as the same. And part of it is from Sheehan. Sheehan indicates that when police have a right to enter, they have that right to enter. They don't have to wait to accommodate someone's disability or engage in further dialogue. These officers had a responsibility to take someone who had been identified as dangerous off the street for his own protection, which admittedly and regrettably failed. And they had no other alternatives but deadly force. At the time that deadly force was used, that was their alternative. At the time. So are we to ignore all the things that lead up to it? In other words, the plaintiff's argument here is that police created the circumstances. They came with what a 302 warrant. He's not charged with any crime. He's not doing anything illegal. He's not acting in a way when he's at his own home that prompts anybody concerned for their safety. He is effectively a guy minding his own business. The police come in. He tells them, I don't want to go with you. And they do things which in the end lead them to shoot him. That's the plaintiff's version. Is it your position that none of the stuff that leads up to them tumbling into the room has any bearing on this? No, not at all. It does have bearing. And the bearing is this. It was not a SWAT team approach. They entered the home with a key provided by Mr. Williams' wife. They entered under the authority of a mental health warrant. They entered with one officer. Was it 10 officers going to that house? It was not an officer. It was 8. It was ultimately 8 officers. Six lined up at the front door, entered the house with the key provided by Mr. Williams' wife. They went in. One had his weapon out at that point. It was Officer Pappy. They had a ballistic shield, but they used the key to enter it. They entered it silently. They swept the upstairs. They go down. They see him retreating into the bedroom. At this point, they go. They try to get him out. Two other officers are let in. Did they have no other options at that point? The police have no option except to break the door down, all of them in a row, tumbling into the room? They have options, but it's an acceptable action under the existing precedent to push in and get it. That's actually where I have a little problem. Why is it reasonable for the officers to act the way they did once they get to his bedroom door? I think it's useful here to view it incrementally. I think that's the way you've done it in your briefs. Once they get to the door, what's the hurry? There doesn't seem to be any danger on the other side, and yet they want to push through. Why is it reasonable to wait, negotiate, take your time, and see what happens? They don't know what's behind that door, and they further know that they have failed with two hours of negotiation before. They know he's behind the door, and for purposes of the discussion, don't they have to know that he doesn't have any kind of gun or anything like that? Well, he tells them, and it's undisputed, he tells them. They enter the door. They're going to be sorry. Yeah. I'll repeat. Isn't it, for purposes of this discussion, a given, based on what the district court said, that they know he's not armed? He's in there by himself, no means of escape, and not armed? The district court did not find that he was not armed. I thought that the undisputed fact was there were no weapons in the home. Tell me that's disputed. The undisputed fact is that the officers were the case, because wouldn't that be a material fact, whether he was armed or not? Will we, could you repeat your question? I thought it was accepted, for purposes of this motion that you had made, that he was not armed, and that everybody knew he was not armed. If you're telling me that that's not the case, I'm asking you, isn't that a dispute that's material? Isn't it material whether somebody is armed or not? I think the distinction, you're using the term armed, meaning possessing a firearm, correct? Yeah. He's got some poker in there, as it turns out, but as far as the police knew, they'd all been told there are no weapons in that house. Right? Correct. Okay, so they're on the outside of the door, he's on the inside, they've been told no weapons in the house, there's no way for him to get out. Now, answer Judge Chigares' question, which is, what makes it right for them to push the door in? What's the rush? The rush is to get him before he... Before he what? Arms himself with something like a poker. He could have a knife, he could have a sword. I guess. Is what you're saying that Judge Jordan, I think, was getting at, maybe this is a distinction that you're trying to make, but they were told there's no weapons. Are you saying, yeah, we were told that, but that doesn't mean there wasn't? Is that what you're saying? That is what I'm saying. And the other distinction is they have a warrant that permits them to apprehend him. Okay, and the fact that they were told that there were no firearms is consistent with their actions. They've been told that there were firearms and someone was dangerous, quite frankly, there would have been a SWAT approach. They would have been all officers with their weapons out. They assumed that, and what happened... So they assumed that, all right, so they assumed there were no weapons. They were told there were no weapons. That brings us back to the question of, other than the fact that they've got a warrant that they want to affect, what creates any time pressure for them? Why do they have to choose to press the confrontation? That seems to be what was an important factor to the district court, and I'd be interested to have your response to it. Why at the door do they say, we've got to knock the door down and get him right now? Well, the one issue is, what was he doing behind the door? They don't know that. But the second thing, and this is crucial, this is crucial to... So you're suggesting behind the door, just to stop you from it, you're suggesting what's going on behind the door could be detrimental to him or somebody else. Yes. Who's the somebody else? Who could possibly have been, possibly was at risk? The officers. How? He could be casting around in the room to find a weapon, which it turned out he did. I thought the understanding was, and that they were moving on the assumption that he was unarmed, because if they had thought he was armed, they wouldn't have done what they did. Here's the thing, your honor, and I want to make sure I emphasize it, for qualified immunity purposes, there is no case law, no case out there that I can find, of any binding precedent whatsoever, that says not waiting and pushing in those circumstances was in any way wrong. And that's what is crucial, because qualified immunity is a two-step process. It's one, was there a violation of a right? And two, was that right clearly established such that a reasonable official would have known? Does our Smith case not bear on this? It does not. It's different in time, and to the extent that it would bear indirectly, there are no good analogs, quite frankly. There's a, this is not clearly established, where we say factors to be considered in making a determination of reasonableness include severity of the crime at issue, whether the suspect poses an immediate threat, whether he actively is resisting arrest, whether he's attempting to evade arrest by flight, possibility of a suspect that may be armed, duration of the in some detail, things to be considered in assessing reasonableness. So you're saying that doesn't have any bearing on this case? It does have a bearing, but I'm saying it's a general statement of the law. Okay. It helps us assess reasonableness, right? It does, in a general setting. The Supreme Court, and it emphasizes this in Sheehan, for qualified immunity to be any immunity at all, it does not have to require strict factual identity, but it has to be substantially, factually similar. Well, it has to be, when you say factually similar, there has to be something that you can look at and frame a question in a fact specific way, and then make a statement about reasonableness, right? Correct. So, officer's on the scene for less than two hours. William's actively engaging in dialogue with the police before they break into his home. The officers believe he's not armed, and they're told he's not armed. He's got no means of escape, and up until they break into the room, there are apparently other options that can be pursued. Those are all things that I thought the district court had in one way or another said, and yet we're at a point in the room where you're saying they had to shoot him, and my question to you is, if we frame the question the way the district court has lined up the facts, can it really be the case that we can say that's a reasonable use of force? Maybe I misspoke. I'm not saying they had to shoot him. I'm saying it was a reasonable use of deadly force under the Constitution, and that there was no binding precedent out there that would have alerted them that it was a violation of his rights. All right. Why don't we give your friend a chance? Thanks. Thank you. Morning, judges. Good morning. My name is Shelly Santini. May it please the court, I represent the estate of Brian Williams, the appellee. Counsel's argument illustrates exactly why this case is a classic case for a jury. Before we get too far into what we talked to your friend about, I've been in both of your seats, and sometimes you have a district court opinion that you're going to try your best to defend. There are a lot of defendants in this case, and didn't the district judge paint what kind of broad brush here that everybody's in? I mean, look at the one guy. The one guy's off-duty, and yet he's implicated in the case. Right. So he's implicated in our supervisory liability claim. That would be Chief Fisher. Yes, right. And the reason he's implicated and he's in is because if you look at the second theory of supervisory liability- No, I get what you're talking about, but does the district court deal with him separately? The district court puts him in the supervisory liability claim. Forget the force claim. Forget the entry claim. All right? Because he failed to maintain and implement policies. He failed to give any direction to anybody on the scene, failed to train the officers, and left somebody in charge, that would be Officer Miller, who he knew had no training and no experience. How about Chief Craig, who's even- he's got no subordinates at the seat. He has no subordinates, but he failed to maintain and implement policies and training for himself. Hold on. He's got supervisory liability because he didn't supervise himself well enough? No, isn't that what you just said? Yes, it is. He's also a chief. If that's the truth, then isn't everybody guilty? Like, you're all lying under supervisory liability because you didn't supervise yourself? Okay, I'm vulnerable on Craig. I'm vulnerable on Craig. Oh, yeah. Well, that gets to Judge Karas's point, isn't it? I mean, you made a persuasive pitch apparently in the district court, and the district court ran with you, but we're talking about 10 different people with varying levels of input and involvement in this. Don't they deserve, and indeed, isn't the district court required to give them some kind of individualized attention? I think that he did give individualized attention because of the fact that each chief is so similarly situated. There's no chief on the scene that gave any of their subordinates any training or implemented any policies relating to the service of mental health warrants. That's across the board. Well, it's not only the supervisor, it's some of the folks here. They all had varying levels of involvement here, much different. I mean, Pappy is the one who, you know- Pappy's a shooter, and he's the only target of the deadly force claim. So you've got to separate out the entry claim, all right? And that entry claim, count one- Well, that's actually a great point, actually separating it out. I wonder if this wouldn't have been better written if you dealt with it in an incremental way, you know, entry to the house, entry to the bedroom, and then whatever happened in the bedroom. Right, I'd like to, because that's kind of how our amended complaint is laid out. So when we're talking about the entry claim, and let's not conflate the two. Under Bodine v. Warwick, we're not supposed to. So let's talk about the entry. The entry is a separate claim, and that has to do with the manner in which the warrant was served. I'm hearing counsel argue that, well, there was a warrant, there was a key. We're not talking about whether there was a warrant, or consent, or probable cause. That's not this case. Yeah, there was a warrant, just like there was in Smith. But the manner in which that warrant is served has to be reasonable. So let's talk about the first entry. Why did he go in? Brian Williams isn't posing a sufficiently serious and immediate threat. He's talking with Chief Ely at the basement door. Well, I don't think it's irrelevant that Mrs. Williams gave a key. It's not irrelevant. It's one of those factors of the totality of the circumstances. But they didn't knock and announce. And by the way, they knew he might be coming out. Brian Williams has three conversations with three people that are family members. His mother, his father, who goes in there twice, and his wife. All of them say, hey, he's packing a bag. He's putting on boots. And he's coming out. Doesn't the father say he's not going to go easily? Yeah, he says that. So you know what? You talk more. Why go in and shoot? Well, now you just took the jump forward, right? Before we get to shoot, there are these other things. How is it the case that in trying to affect the service of a mental health warrant, it is manifestly unreasonable that only the plainly incompetent would think we need to actually affect the warrant. We need to actually take him into custody. Because Smith, too, says that if he's not posing a sufficiently serious and immediate threat, that you got to wait. You can't go in. You can't storm a house. Wait how long? I mean, as long as it takes. Really? So you would be responsible to barricade the house. And if the guy has shut off his electricity, shut off his water, if it takes a week, if he's got food storage, you got to wait a week. You can never do affect a warrant. No, I'm not saying that. But you got to execute it safely and reasonably. How long do you think they've got to wait? They engage in dialogue with him. He says, I'm not coming out. Over the span of two hours, they keep trying to persuade him in multiple different ways. Come on out, Mr. Williams. And he won't do it. Don't they have an obligation, some obligation, to actually make the arrest? Particularly insofar as your friend points out persistently in the brief, at least his docs say he's a clear and present danger. Well, OK. So there's two different issues. First of all, to get to what Judge Jordan asked me, how long do you wait? I don't know. I'm not trained. But neither were they. Maybe a CERT team would have been the people to answer that question. Here's the point. If the plaintiff can't say, this is what's right and reasonable, and then how is it right to say, it's clearly wrong to make a move at two hours? Clearly wrong. OK, so that actually touches on the issue of dangerousness. So talking about the boxes checked on the 302 warrant, the pro forma box which says he's clear and presently dangerous. Well, that was hours before. And you can't just take that and run with it. You have to, as an officer on the scene, go with what you're seeing. So what are they seeing? He's come. He's talking to them. He's not refusing to talk. They enter while he's speaking with them. He's saying to three different people, hey, I'll come out. But I don't want to go with you, police officers. I'd like to go to my mother's. But maybe he'll come out. He's making those representations. He hasn't cut off communication. So you can't ignore that and say, well, a box was checked on a form two hours ago. And therefore, he's dangerousness. That's the circumstance that was confronted in Smith 2, which then ties back to how is this these contours clearly established. So in Smith 2, you have a guy who has a cache of weapons, by the way, inside his house. Pointing a laser sight from a firearm, presumably at a police officer in New York. Clear threat, direct threat. Nine hours later, after they have no contact with him, they storm the house. And the court said you have to reassess the reasonableness of the entry in that intervening time frame. Same thing here, much shorter time frame. But they can't ignore what's going on at the scene and say, well, he's declared presently dangerous. Doctor said so. We're just going to go in and get him. So even though they've got the medical professional's representation that this person is dangerous, you're saying his behavior on the scene, they should have exercised their independent judgment about whether he was dangerous. Can't ignore what they're seeing. That's not reasonable. But you are saying it's unreasonable for them to rely on the representation in the ward. No, that's part of the totality of the circumstances. So you've got to take that into consideration. We've got to approach with caution. But if he was so dangerous, then why didn't they let the father in the house twice? I mean, their conduct on the scene belies that argument. Why is Chief Ely speaking with him face to face through a semi-open door? I mean, you can see he doesn't have any weapons. Why the wife, who is the supposed target of these threats, why are they even allowing her in the driveway? Why are they letting her on the phone with him to talk with him if he's so dangerous? I mean, you can't say he's dangerous, we've got to get him right now. But then the conduct on the scene and the facts as they play out have no bearing on the analysis. It seems like you're giving them a sort of damned if you do, damned if you don't position Ms. Santini. Because you're saying they should have de-escalated and yet you're faulting them for their behavior on the scene for things that might be viewed as trying to de-escalate. That they allowed contact with the family for most of the time. They tried to talk to him themselves. They allowed the father to go in and try to talk him down. Those were things. Oh no, I don't fault them for that. I think that was reasonable. But that also plays into whether or not there was dangerousness. The escalation comes when they bust in the house without knocking, without announcing. Take him by surprise. Force this mentally ill man into a position where he has no idea that there are police storming his house while he's actively speaking and negotiating with Chief Ely. Forcing him to retreat into a basement bedroom. But when you say forcing him, really, he was never at any point forced, right? A big measure of your argument here seems to be he's not responsible for his own actions. There's a warrant for him. It's a lawful warrant. His family and the police are trying to get him to comply with the warrant. He's just flouting the lawful authority of the people who were there to effect the warrant. No, that disregards his mental illness. So we don't know how that plays into the totality of the circumstances. Again, another jury question. You know, what is his mental state at that point in time? I mean, you and I, that might be resisting arrest. For him, we don't know what it was that was going through his mind at that time. We've got to take it. We've got to take it. We can't slide around on that. We've got to take it on what the district court has said, that his demeanor is calm and he does not appear to be agitated, et cetera, right? And the very argument you were making a few minutes ago, which is, they should be paying attention to what's happening right there. So if they have somebody who appears to be in possession of his faculties, he's engaging with them, and he's just saying, I don't care what you say, I'm not coming. I'm just not coming outside. Well, he's saying that. He's saying something else. But you don't fight when you're parlaying, right? So they come in, and there's the door. Now, we're in a situation where, by the way, there are 10 officers. Miller, Ely, Olszewski, Craig, Hardy, Roberts, Poppe, Profka, two state police non-defendants, and one outside the window. By my count, that's 10 in, one outside the window. All entry points are covered.  Why bust down the door? So does it really come down to timing? Are you saying that it's not that they weren't allowed to affect the warrant? They just should have waited longer. It's reasonableness. Same as with the search warrant, right? If you're looking for a machine gun, you can't look for it in a bread box. It has to be reasonable. The execution of the warrant has to be reasonable. But the standard here is, again, qualified immunity, as I understand it, all but the most plainly incompetent government official in the execution of their duty, right? It's very heavily tilted. The Supreme Court has said, deliberately tilted toward the defendant. So if it comes down to just timing, as to the entry into the house, how can we say there's between two hours and three hours, or two hours and four hours? Three hours, maybe you could go in. Four hours, definitely you could go in. Two hours, plainly incompetent. There are no hard and fast standards. You can only look at the facts of each individual case. Is it objective reasonableness? Is this a question of law? You seem to be saying, hey, this is a question of fact, whether it was reasonable to go in at that point. Right, under these circumstances. I thought under Curley v. Clem that we had said that the question is objective reasonableness and for the court to decide. In Curley v. Clem, I think the court said that there were disputed facts, in that case, about whether a gun was pointed down or pointed up, and if that case should have been remanded. Similar to our case, where there's a disputed fact about whether the poker's pointing at them, or an incredible story about how it could possibly be extended above the head. I've heard him say at the podium today, they accept he was not in any kind of attack mode. He was strictly in a defensive posture with that. Then how do you shoot? You'd like to grab that and run with it, right? How do you shoot? Well, indeed, that's an important legal question. Getting back to Curley v. Clem, isn't the reasonableness of the officer's behavior at two hours to go into the house, is that not a question of law for the court? It also turns on the facts of the case. They can't ignore all of those two R factors and the facts that support them. So it has to be looked at that way. What are the facts that are in dispute at that point? What are you looking at that you say, wait, factual dispute? The court's given you a whole bunch of stuff, indeed, found in your favor, and says, I'm looking at this in the light most favorable to the plaintiff here. What is it that you think, wait a second, there's a material dispute fact at that stage one? Remember, we're dealing with this in stages, about the decision to go in at two hours. That makes it either factually, I'm not sure what's going on, I know what's going on, and it's absolutely unreasonable as a matter of law. Because he's talking, because he's communicating, because he's negotiating, because he's not saying, no, I don't want to talk to you. He's saying, in fact, I like talking with this particular officer. Because nobody's in any threat, he's not using threatening communication. He's not suggesting that he might harm himself. He's not saying he might harm anybody else. He's saying, I don't want to go to the mental hospital. I need to work and support my family. He's asking to talk to his wife. He's asking to talk to his mother. These are all things that have to be considered in that reasonableness analysis. Why go in? Okay, thank you counsel. Thank you. Thank you, your honor. I just have a couple of very brief points. The plaintiffs and the trial court are trying to define the law at an unacceptably high level of generality. I can't emphasize it enough. There has to be existing applicable binding law out there. Where do you get that? Where do you get the applicable binding law? The Supreme Court has said specifically, you do not have to have a case on all fours. That would be, you know, they've given examples. There's no case that says child welfare workers can't sell children into slavery, but that doesn't mean that if we ever caught them, they could say, hey, it wasn't clearly established. I mean, there are things, facts, circumstances, which you can look at and say, well, no, that behavior is manifestly unreasonable and outside the law. Where do you get this idea that there has to be a binding precedent? Perhaps I should have been more careful. In the excessive force context, I would agree by an example set by your Honor. In any context, there's nothing magic about the excessive force context. It's the same as any other. I think, though, in this case, it's clear. I mean, you could see how plaintiff's counsel struggled to articulate the standard that police assertedly violated in this matter. That's the issue. Qualified immunity is a two-part defense. Was there a right that was violated, and was it clearly established such that they would know? The Supreme Court has said this as well. It is predicated that way so that the court can, in appropriate circumstances, and it may feel that this is one, indicate that there was, under these argued facts, a violation, but that the standard was not clearly enunciated so that these officers would know what they were doing was wrong. Then the second part of the immunity analysis applies. I have no further rebuttal. If there are any questions, I'll be happy to handle them. Okay. Well, thank you, counsel. Thank you, Your Honor. We'll take this difficult case under advisement. Thank counsel for their excellent briefing and argument. We'll ask that Ms. Amato adjourn court.